IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>vs.<br><br>$45,000.00 IN UNITED STATES CURRENCY AND 2001 ITASCA SUNCRUISER MOBILE HOME, VIN5B4LP57G013332941,<br><br>      Defendant. | **8:12CV00320**<br><br>**MEMORANDUM AND ORDER** |

  This matter is before the court on Claimant Hugo L. Soto's Motion to Suppress evidence, (Filing No. 16). For the reasons set forth below, the motion will be denied.[1]

BACKGROUND

  During the evening of February 29, 2012, Nebraska State Trooper Derek Kermoade was patrolling Interstate 80 near Lincoln, Nebraska. At around 9:20 p.m., he observed a recreational vehicle ("RV") traveling westbound between mile markers 397 and 400. Kermoade observed the RV signal and change lanes from the far left lane of Interstate 80 to

---

[1] The above-captioned action is not a criminal case, but rather a civil action for return of property seized by the government as money derived from, or used to facilitate, criminal activity. The outcome of the defendant's pending motion is not case dispositive. Irrespective of the ruling on the Fourth Amendment issue, the court will have to decide if the seized property was acquired by lawful, rather than criminal, means. (Filing No. 9, ¶ 5). Finally, the pending motion was not specifically referred to the undersigned magistrate judge for only findings and a recommendation; it was assigned as a matter course consistent with the goal of Congress and this district to fully implement the resources of magistrate judges.

  In actions for return of seized property, "[t]he court must receive evidence on any factual issue necessary to decide the motion." Fed.R.Crim.P 41(g). Rule 41(g) (previously identified as rule 41(e)) was amended in 1989 to replace the word "judge" with the word "court" to "clarify that a magistrate may receive evidence in the course of making *a finding or a proposed finding* for consideration by the district judge." Fed.R.Crim.P 41(g)(1989 amendments) (emphasis added). Under the circumstances presented as outlined in this footnote, rather than issuing a proposed finding (Findings and Recommendation) for Judge Gerrard's consideration, the undersigned magistrate judge will issue a finding (Memorandum and Order) on the claimant's motion.

the center lane. Believing the driver had not travelled the necessary 100 feet after signaling before changing lanes, Kermoade initiated a traffic stop of the RV.

The claimant, Hugo Soto, was driving the RV. At the officer's request, Soto produced his Illinois driver's license, but he was unable to locate and provide a vehicle registration. Kermoade ordered Soto to join him in the Kermoade's patrol car. Kermoade contacted dispatch to check Soto's license and the registration status of the RV. While processing Soto's information, Kermoade engaged Soto in a general conversation about the origin and destination of Soto's trip and with whom he was traveling. Soto appeared unusually nervous during his communications with Kermoade. While Kermoade and Soto were in the patrol vehicle, a second trooper arrived at the scene. The second trooper did not join Kermoade's conversation with Soto inside the patrol vehicle.

Approximately 20 minutes after initiating the traffic stop, Kermoade issued Soto a warning for failure to properly signal his lane change and returned Soto's driver's license. A portion of the elapsed 20 minutes was dedicated to tracking down information on the RV because Soto did not produce a copy of the vehicle's registration.

After issuing Soto the written warning and telling Soto he was "good to go," Kermoade asked Soto if Kermoade could ask a few more questions. Soto agreed. Kermoade proceeded to ask Soto if he had any marijuana, methamphetamine, or weapons in the vehicle. Soto denied having any of those items. Kermoade then asked Soto if he had any large amounts of cash in the RV. Soto looked at the RV, paused, and replied that he did not. Kermoade asked Soto for consent to search the RV. Soto orally agreed to let Kermoade search the vehicle. Kermoade read a written consent form to Soto which stated Soto was allowing Kermoade to search the RV. Soto signed the consent form.

Kermoade searched the RV and found currency totaling approximately $40,000. The government seized the currency and the RV as property arising from or facilitating drug

related criminal activity. Soto claims the property must be returned to him because it was seized in violation of his Fourth Amendment rights. (Filing No. 9).

## ANALYSIS

A.   The Traffic Stop.

"The Fourth Amendment's exclusionary rule applies to quasi-criminal forfeiture proceedings." United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 646 (8th Cir. 1999). The Fourth Amendment prohibits unreasonable searches and seizures. United States v. Hollins, 685 F.3d 703, 705 (8th Cir. 2012). A traffic stop constitutes a seizure of a vehicle's occupants and must be supported by reasonable suspicion or probable cause to be lawful. Id. at 706.

Soto argues no probable cause existed to justify stopping the RV. "It is well established that any traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver." United States v. Washington, 455 F.3d 824, 826 (8th Cir. 2006). "To determine whether a traffic stop was based on probable cause or was merely pretextual, an 'objective reasonableness' standard is applied." United States v. Mallari, 334 F.3d 765, 766 (8th Cir. 2003). That is, "[a]n officer is justified in stopping a motorist when the officer 'objectively has a reasonable basis for believing that the driver has breached a traffic law.' " Id. at 766-67 (quoting Untied States v. Thomas, 93 F.3d 479-485 (8th Cir. 1996)). Where an officer's "understanding of the law is simply unreasonable . . . the officer's belief that there is a traffic violation would not be sufficient to establish probable cause to stop the vehicle." Id. at 913 n. 3. "But [t]he determination of whether probable cause existed is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time." United States v. Sanchez, 572 F.3d 475, 478 (8th Cir. 2009) (quoting United States v. Sanders, 196 F.3d 910, 913 (8th Cir. 1999)). Law enforcement officers are not required "to interpret the traffic laws with the subtlety and expertise of a criminal defense attorney." Sanders, 196 F.3d at 913.

3

While any traffic violation provides the requisite probable cause for an officer to initiate a traffic stop, if the officer is mistaken as to whether a violation has occurred, either in law or in fact, "the validity of the stop depends on whether the officer's actions were objectively reasonable in the circumstances." United States v. Martin, 411 F.3d 998, 1001 (8th Cir. 2005) (internal citations omitted). Stated another way, a finding of probable cause will still be supported where the officer's mistake was an objectively reasonable one. United States v. Hastings, 685 F.3d 724, 728 (8th Cir. 2012).

Kermoade initiated the traffic stop for an alleged violation of Neb. Rev. Stat. 60-6,161(2), which states: "A signal of intention to turn or move right or left when required shall be given continuously during not less than 100 feet travelled by the vehicle before turning." Soto contends he did not violate the statute in question, and Kermoade's stated reason for initiating a traffic stop was not objectively reasonable. In support of his argument, Soto enlisted the assistance of civil engineer, Peter Himpsel, to evaluate the video recording of the traffic stop and determine whether the RV traveled the requisite 100 feet from the time Soto activated his turn signal until the time it crossed the lane marker. Through his frame-by-frame analysis of the recording, Himpsel determined the RV traveled straight ahead for .7 seconds after signaling to change lanes and before it began to move laterally towards the center lane, and that it started crossing the line separating the lanes approximately 1.4 seconds after signaling. Based on an estimated speed of 65 miles per hour, Himpsel opined that the RV traveled 204 feet after signaling and before crossing the lane boundary into the middle lane.

The United States presented testimony from Trooper Perdram Nabegh, an accident reconstructionist for the Nebraska State Patrol. Nabegh opined that the RV, traveling at approximately 60 miles per hour, would have moved 147.75 feet from the time the turn signal illuminated until the RV began to cross the lane marker, and that the total time between turning on the blinker and crossing to a different lane was 1.67 seconds.

4

Therefore, based on the evidence provided by both experts, Soto did not violate Neb. Rev. Stat. § 60-6,161(2) at the time Kermoade initiated the stop. That is, Kermoade's conclusion that the RV traveled fewer than 100 feet before making the lane change was incorrect. The court must therefore decide whether Kermoade's mistake of fact was objectively reasonable.

Soto contends the vehicle traveled over twice the required distance and, under those circumstances, Kermoade's mistake cannot be considered objectively reasonable. He argues that Kermoade's testimony that he witnessed a "simultaneous" lane change "has been completely discredited" by the analysis of both experts and the video recording of the traffic stop.

Although the court finds the expert testimony credible, that finding does not determine whether Kermoade's real-time interpretation of those events, as described during his testimony, was reasonable. In support of his argument challenging Kermoade's credibility, Soto explains that after analyzing the video recording with computer technology, it is clear the RV traveled in a straight line for approximately .7 seconds before initiating any lateral movement. Citing Scott v. Harris, 550 U.S. 372 (2007) and United States v. Prokupek, 632 F.3d 460 (8th Cir. 2011), Soto argues Kermoade's testimony must therefore be disregarded because, based on the video recording, Kermoade could not have seen the RV begin its lane change immediately or simultaneously with the activation of Soto's turn signal.

In Scott, a driver who led police on a high speed chase sought recovery under 42 U.S.C. § 1983 for injuries sustained when his vehicle was ultimately rear ended by a pursuing patrol vehicle. The driver sued the police, claiming the pursuing officers used excessive force to stop his vehicle because although he was fleeing to avoid arrest, his driving posed very little threat to pedestrians and the roads were mostly empty when the chase occurred. The district and appellate courts accepted the driver's version of the facts and denied the officer's qualified immunity defense. But the in-car camera recording of the

event revealed a high speed chase down a narrow two-lane road, with cars travelling both directions pulling over to avoid being hit, and the pursued vehicle crossing the center line and running red lights. Scott, 550 U.S. at 378-79. Although the lower courts concluded the driver's affidavit raised an issue of fact on whether the pursuing officer's conduct was reasonable, the Court reversed, holding that the driver's "version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape." Scott, 550 U.S. at 380-81. Similarly, in United States v. Prokupek, 632 F.3d 460 (8th Cir. 2011), the in-car camera recorded an officer's statement that was directly contradicted by his testimony at a suppression hearing. Id. at 463. Based on the recording, the officer stated he stopped the driver for failing to signal while exiting from the interstate. But at the hearing, the officer testified the driver failed to signal his turn from the interstate off-ramp onto a country road. The court found this evidence "implausible on its face" because the testimony was "so clearly and affirmatively contradicted by [the officer's] own statement at the time of the events." Id. at 463.

Under Harris and Prokupek, the court cannot blindly accept testimony that is directly contradicted by video or audio recordings. But this case contains neither of the obvious and clear contradictions found in Harris or Prokupek. The video recording of Soto's traffic stop is subject to reasonable interpretation, including what the term "immediately" or "simultaneously" means. See, e.g., Mills v. City of Harrisburg, 589 F. Supp. 2d 544, 552 n. 5 (W.D. Penn. 2008)(distinguishing Scott, where the audio recording was subject to reasonable interpretation). It is not unreasonable, implausible, or untruthful to describe an event that took less than a full second – i.e., the beginning of the RV's lateral movement initiating the lane change – as occurring immediately or simultaneously.

Although Soto argues that the total distance traveled by the RV was twice that required by law, based on the testimony of Soto's expert, the entire event lasted only 2.1 seconds. Unlike lawyers in a courtroom, law enforcement officers lack access to accident

reconstruction techniques or the frame-by-frame analysis of a video recording when deciding whether to initiate a traffic stop. While Kermoade testified he has been trained to evaluate the 100-foot barrier based on the speed of the vehicle, law enforcement officers are expected to be reasonable, not perfect. Based on the court's review of the evidence, including its own review of the video recording, the consistency in Kermoade's explanation for the stop, and the short time span of the entire event, the court finds Kermoade's belief that Soto failed to timely initiate his turn signal before changing lanes was not unreasonable.

B. <u>Consent to Search—Purging the Taint</u>

As an alternative argument, the United States argues that even if the stop was not supported by probable cause, Soto's consent to search the RV purged any taint arising from the impermissible traffic stop. Evidence seized from an illegally stopped vehicle need not be suppressed if the claimant's "voluntary consent provide[s] an independent basis for the search." United States v. Esquivel, 507 F.3d 1154, 1158-59 (8th Cir. 2007).

The court considers the totality of the circumstances when deciding whether a consent to search was voluntary. The government must prove by the preponderance of the evidence that Soto voluntarily consented to the search of the RV. If he did, the court must consider whether Soto's consent was sufficient to purge the taint of any illegality of the traffic stop, questioning, or detention which occurred prior to obtaining the consent to search.

1. <u>Consent</u>

The court must decide whether an objectively reasonable officer would have believed Soto consented to the search of the RV.

> In evaluating the reasonableness of the officer's belief, we consider the characteristics of the person consenting, "including the party's age, intelligence and education, whether he was under the influence of drugs or alcohol, whether he was informed of his right to withhold consent, and whether he was aware of rights afforded criminal suspects." United States v. Almendares, 397 F.3d 653, 660 (8th Cir.2005). We also consider the environment in which the alleged consent took place, "specifically (1) the length of time he was

7

> detained; (2) whether the police threatened, physically intimidated, or punished him; (3) whether the police made promises or misrepresentations; (4) whether he was in custody or under arrest when the consent was given; (5) whether the consent occurred in a public or a secluded place; and (6) whether he stood by silently ... as the search occurred." United States v. Smith, 260 F.3d 922, 924 (8th Cir.2001).

United States v. Esquivias, 416 F.3d 696, 700 (8th Cir. 2005).

Once Soto was issued a warning and the trooper returned his paperwork, Soto had everything he needed to be on his way. See United States v. White, 81 F.3d 775, 779 (8th Cir. 1996). Soto was an English-speaking adult of sufficient intelligence to understand what was happening and communicate with the officer. Kermoade maintained a conversational tone throughout the traffic stop, and never threatened Soto, promised him anything, or indicated Soto was required to consent to the search. The traffic stop occurred on a public roadway. Soto did not appear to be under the influence of alcohol or drugs. Soto consented to the search both orally and in writing. Although Soto was not expressly told his consent was voluntary, Kermoade implied that it was. After Soto agreed to the search, Kermoade asked, "You're okay with that?"—clearly suggesting Soto was not being compelled to allow a search of the RV. Although Soto was placed in the patrol car during the search, he was instructed he could honk the horn to get the officers' attention. He never did so, and made no other attempts to stop the search.

Based on the totality of the facts presented, the court finds Soto's consent was voluntary and that a reasonable officer in Kermoade's position would have believed it was knowingly and voluntarily given. See, e.g., United States v. Santos-Garcia, 313 F.3d 1073 (8th Cir. 2002) (holding consent to search was voluntary even though the defendant was not advised that he could deny consent where the defendant was given a warning for speeding and his license and registration were returned, he stated in writing and orally that the vehicle could be searched, the tone of the encounter was conversational and there was no evidence of threats or coercion); United States v. Kreisel, 210 F.3d 868 (8th Cir. 2000) (holding the

driver's consent to search a vehicle was a voluntary "act of free will that validated the search" even though the vehicle stop itself was based on an erroneous belief that the truck was a being used for commercial purposes).

    2.    <u>Purge of Taint</u>

Having concluded Soto's consent to search the vehicle was voluntary, the court must now decide if a sufficient attenuation existed between the allegedly unlawful traffic stop and the consent to search such that the consent purged any taint arising from the stop.

> To determine whether sufficient attenuation between the unlawful act and the consent exists, "we consider the following factors: (1) the temporal proximity between the illegal search or seizure and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." Becker, 333 F.3d at 862. The determination is made by carefully weighing the facts of each case, and no single fact is dispositive. United States v. Ramos, 42 F.3d 1160, 1164 (8th Cir.1994).

United States v. Herrera-Gonzalez, 474 F.3d at 1111.

"[C]onsent given a short time after the stop [is] sufficient to purge the taint if other circumstances indicate the consent was sufficiently an act of free will." Herrera-Gonzalez, 474 F.3d at 1112 (citing United States v. Palacios-Suarez, 149 F.3d 770, 772-73 (8th Cir. 1998)). Here, Soto's consent to search occurred approximately 20 minutes after the initial stop. This time frame, while brief, has been considered sufficiently long to support the findings that a consent to search purged the taint of an unlawful stop. Herrera-Gonzalez, 474 F.3d at 1112 (a time period as short as ten minutes from the initial stop is not, in and of itself, a sufficient amount of time to determine a confession was involuntary); Palacios-Suarez, 149 F.3d at 773 (consent to search given nine minutes after the initial stop was upheld as purging the taint of an allegedly illegal stop). But see United States v. Wise, 418 F. Supp. 2d 1100, 1109 (S.D. Iowa 2006) (noting there generally must be some break in time between the illegal stop and the consent to search).

9

Intervening circumstances arising after the allegedly illegal stop may prompt an officer to reasonably believe further investigation is appropriate. See Herrera-Gonzalez, 474 F.3d at 1113 (officer's inability to verify the defendant's identity and license plates sufficient); United States v. Becker, 333 F.3d 858, 860 (8th Cir. 2003) (officer's suspicion the driver might be under the influence). During the course of the traffic stop, Soto appeared unusually nervous and Kermoade had trouble verifying information about the vehicle due to the absence of a registration. After the warning ticket was issued, Soto agreed to answer some additional questions. And, although he promptly denied possession of drugs or guns in the RV, he hesitated and looked at the RV before denying he had large amounts of U.S. currency. From the perspective of an objectively reasonable officer, these facts considered in the totality constituted "intervening circumstances" sufficient to support the second factor of the "purge the taint" analysis.

As to the final factor, the purpose and flagrancy of the official misconduct is considered "the most important factor because it is directly tied to the purpose of the exclusionary rule-deterring police misconduct." Simpson, 439 F.3d at 496; Esquivel, 507 F.3d at 1160. In this case, there is no evidence of police misconduct. At most, Kermoade made a one- or two-second mistake when assessing whether Soto signaled a lane change sufficiently in advance of crossing into another lane. Kermoade reasonably, albeit mistakenly, believed Soto violated Nebraska's traffic laws. There is no evidence supporting a finding that absent this mistake, Kermoade's conduct could even be challenged as violating Soto's Fourth Amendment rights. That is, Kermoade did not unreasonably question or detain Soto before requesting consent to search, and treated Soto professionally throughout the traffic stop.

When viewed in the totality, the court finds that Soto's consent to search the RV sufficiently attenuated to purge the taint of any Fourth Amendment violation (assuming there was any) arising from the traffic stop.

Accordingly,

IT IS ORDERED:

1) Claimant Hugo L. Soto's Motion to Suppress evidence, (Filing No. 16), is denied.

2) A telephonic conference with the undersigned magistrate judge will be held on **September 30, 2013** at **9:00 a.m.** to discuss the schedule for progression of this case to trial. Counsel for government shall place the call.

Dated this 16th day of September, 2013.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

11